UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANTOINE AJAKA, et al., *Plaintiffs*, v. ANDREA M. GACKI, Director of the Office of Foreign Assets Control, Department of the Treasury, et al., *Defendants*. | Civil Action No. 1:19-cv-01542 (CJN) |

## **MEMORANDUM OPINION**

Plaintiffs Antoine and Anni Ajaka challenge their designation as "Specially Designated Nationals" by the Department of the Treasury's Office of Foreign Assets Control ("OFAC"). *See generally* 2d Am. Compl., ECF No. 12. Pending before the Court is the government's Motion to Dismiss or, in the alternative, Motion for Summary Judgment. *See generally* Defs.' Mot. to Dismiss or for Summ. J. ("Defs.' Mot."), ECF No. 18. Because OFAC's designation was not arbitrary and capricious and did not deprive the Ajakas of due process, the Court grants summary judgment to the government.

### I. Background

On March 21, 2018, the Ajakas[1] were indicted in the District of Massachusetts on fourteen counts related to their alleged business transactions with Syrian entities involved in chemical weapons development. *See generally* Administrative Record ("AR"), ECF No. 25-1 at 73. The indictment charged the Ajakas with illegally exporting to and acting as a broker for those entities

---

[1] Anni Ajaka also goes by Anni Beurklian. Because both names are used throughout Plaintiffs' filings and the Plaintiffs bring their claims jointly, the Court refers to the Plaintiffs as "the Ajakas."

1

and attempting to conceal their illicit conduct through falsified paperwork and false statements to the government. *Id.* at 75–76. It also alleged that, in January 2018, the Ajakas fled the country while purportedly engaged in pre-indictment plea negotiations with the government. *Id.* at 54.

A few months after the Ajakas' flight, OFAC designated the pair "Specially Designated Nationals" pursuant to Executive Order 13382. 2d Am. Compl. ¶ 1. In an accompanying press release, OFAC identified the Ajakas as "key components of a vast network procuring electronics on behalf of Syria's Scientific Studies and Research Center (SSRC), the agency responsible for the development of Syria's chemical weapons." *See generally* 2d Am. Compl.; Compl. Ex. 1 ("OFAC Press Release"), ECF No. 12-1 at 1. In particular, the press release alleged that the Ajakas had operated a company out of their Massachusetts home to "export electronics, computer equipment, and electrical switches to enhance Syria's capacity to produce weapons of mass destruction." OFAC Press Release at 5. The designation blocked the Ajakas' property and interests in property subject to the jurisdiction of the United States and generally prohibited U.S. persons from engaging in transactions with them. AR at 1.

Through counsel, the Ajakas submitted several letters to the government regarding their designation. 2d Am. Compl. ¶ 14. Three letters specifically sought "delisting, expedited treatment, a meeting to discuss the designations, and access to the administrative record." *Id.*[2] The government did not respond to any of those communications and the Ajakas filed this suit on May 24, 2019. 2d Am. Compl. ¶ 15; *see generally* Compl., ECF No. 1. A couple months later, the government produced the administrative record for the Ajakas' designation. AR at 1. The public portion of the administrative record consists of (1) the OFAC designation, (2) the Federal

---

[2] The Second Amended Complaint alleges that the Ajakas submitted four letters requesting reconsideration, but one of those letters is actually a Freedom of Information Act request for records regarding OFAC's designation. 2d Am. Comp. Ex. 2B, ECF No. 12-2.

Register notice regarding the designation, (3) a partially redacted memorandum providing the basis for OFAC's designation, (4) Executive Order 13382, (5) several letters from U.S. Immigrations and Customs Enforcement describing the Ajakas' illicit conduct (and the emails in which they discussed that conduct), (6) a District of Massachusetts press release discussing the indictment against the Ajakas, and (7) a copy of the indictment. *Id.*

The Ajakas allege that the government violated their due process rights by failing to promptly provide them with the administrative record or timely consider their reconsideration requests. 2d Am. Compl. ¶¶ 21–25. They also allege that OFAC's designation was arbitrary and capricious because it was not based on substantial evidence. *Id.* ¶¶ 26–30. The government moves to dismiss the Ajakas' claims under the fugitive disentitlement doctrine; in the alternative, it moves for summary judgment on the grounds that the designation was proper under the APA and that the due process claim is moot (and that the Ajakas were not denied due process even if there was a due process claim properly before the Court). *See generally* Defs.' Mot.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the pleadings and evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under the APA, a court will "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is "'narrow' . . . as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court presumes the validity of agency action, *see, e.g.*,

*Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000), and will not "substitute [its] judgment for that of the agency," *Sioux Valley Rural Television v. F.C.C.*, 349 F.3d 667, 679 (D.C. Cir. 2003). Instead, the Court reviews the administrative record to determine whether the agency's decision was supported by a rational basis. *See Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). The Court's review of a decision made by OFAC is even more deferential because OFAC operates "in an area at the intersection of national security, foreign policy, and administrative law." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007).

### III.    Analysis

#### A. Fugitive Disentitlement Doctrine

As a preliminary matter, the government asks the Court to dismiss the Ajakas' claims because they are fugitives from justice. Defs.' Mot. at 13–19.[3]

The fugitive disentitlement doctrine is an equitable doctrine that permits a court, in its discretion, to dismiss a fugitive's "appeal or writ of certiorari if the party seeking relief is a fugitive while the matter is pending." *Degen v. United States*, 517 U.S. 820, 824 (1996). The doctrine "first developed as a way for courts to dismiss appeals in criminal cases by defendants who had escaped custody after filing the appeal and were evading the jurisdiction of the court." *United*

---

[3] Courts that have considered motions invoking the fugitive disentitlement doctrine have called them motions to strike the claim or answer and enter judgment, *see, e.g.*, *United States v. Timbers Preserve*, 999 F.2d 452 (10th Cir. 1993); motions to dismiss the claim, *see, e.g.*, *United States v. $1,278,795.00 United States Currency*, 2006 WL 870364 (S.D. Tex. Mar. 30, 2006) (construing motion to strike answer as motion to dismiss claim); *United States v. All Right, Title, and Interest in Real Property & Appurtenances Located at Trump World Towers*, 2004 WL 1933559 (S.D.N.Y. 2004); *United States v. One Parcel of Real Estate at 7707 S.W. 74th Lane*, 868 F.2d 1214 (11th Cir. 1989); or motions for summary judgment, *United States v. One 1988 Chevrolet Cheyenne Half–Ton Pickup Truck*, 357 F.Supp.2d 1321 (S.D. Ala. 2005) (construing motion captioned as one to strike claim or in alternative for partial summary judgment); *Lazaridis v. The Herald Co.*, 2006 WL 222839 (W.D. Mich. Jan. 26, 2006) (treating common law fugitive disentitlement motion as one to dismiss under Rule 12(b)(6) and converting to summary judgment). Virtually every court to have considered disentitlement has looked to matters outside the pleadings to evaluate the propriety of dismissal. *See, e.g.*, *United States v. $6,976,934.65 Plus Int.*, 478 F. Supp. 2d 30, 38 (D.D.C. 2007); *United States v. $1,231,349.68 In Funds*, 227 F. Supp. 2d 130, 132 (D.D.C. 2002).

*States v. $6,976,934.65, Plus Int. Deposited into Royal Bank of Scotland Int'l, Acct. No. 2029-56141070, Held in Name of Soulbury Ltd.*, 554 F.3d 123, 127 (D.C. Cir. 2009) [hereinafter *Soulbury*]. Dismissal was an exercise of a court's inherent authority "to refuse to hear a criminal case in error, unless the convicted party . . . is where he can be made to respond to any judgment we may render." *Degen*, 517 U.S. at 824 (quoting *Smith v. United States*, 94 U.S. 97, 97 (1876)). Although the Court of Appeals initially extended the doctrine to civil cases, *see Doyle v. U.S. Dep't of Justice*, 668 F.2d 1365, 1366 (D.C. Cir. 1981) (affirming dismissal of FOIA request related to criminal sentence appellant was evading by remaining in Panama), the Supreme Court later limited disentitlement to situations in which dismissal was a "reasonable response to the problems and needs that provoke it," *Degen*, 517 U.S. at 823–824, and held that dismissal of claims in civil forfeiture actions was a disproportionate response to the problem of allowing a fugitive to litigate a related civil proceeding. The Court did not, however, reach the issue of whether a court could enforce "a disentitlement rule under proper authority." *Id.* at 828.

Congress responded to the Court's invitation by enacting the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. No. 106-185, 114 Stat. 202 (2001). Section 14 created the fugitive disentitlement statute, which grants courts the authority to "disallow a person from using the resources of the United States in furtherance of a claim *in any related civil forfeiture action* or a claim in *third party proceedings in any related criminal forfeiture action*" upon a finding that such person met certain statutory requirements regarding his or her fugitive status. 28 U.S.C. § 2466(a) (emphasis added). Since then, courts in this District have exercised that statutory authority to dismiss a fugitive's civil forfeiture claims when there is a sufficient connection between the claimant's fugitive status and the underlying proceedings. *See, e.g.*, *United States v. Any & all Funds on Deposit in Acct. No. XXXXX-XXXXXXXX at HSBC Bank PLC, 55 Corp. St., Coventry,*

5

*United Kingdom*, 87 F. Supp. 3d 163, 168 (D.D.C. 2015); *United States v. $1,231,349.68 In Funds*, 227 F. Supp. 2d 130, 133 (D.D.C. 2002).

There is, of course, one obvious problem with the government's attempt to invoke the doctrine in this case: the proceeding is neither a criminal appeal within the scope of the traditional doctrine nor a civil forfeiture proceeding within the scope of the disentitlement statute. And while the Court of Appeals has contemplated the applicability of the doctrine in civil cases when there is "an adequate connection" between the proceedings and the claimant's fugitive status, *see Daccarett-Ghia v. Comm'r of Internal Revenue Serv.*, 70 F.3d 621, 629 (D.C. Cir. 1995), such a connection is absent here. The Court of Appeals has made clear that a sufficient "connection" would require more than commonality of subject matter; the individual's fugitive status must "affect[] the court's ability to carry out its judicial business []or prejudice[] the government as a litigant," *id.* at 626. And the "judicial business" affected must be in the court's "*own* docket and its *own* proceedings." *Id.*

The government argues that the Ajakas' fugitive status provides a connection warranting disentitlement because their status and claims "rely on similar factual predicates" and the claims' apparent goals are "obtain[ing] information about the criminal investigation that [the fugitives] are avoiding and have attempted to obstruct already" and providing "assets [that] will further assist their flight from justice." Defs.' Mot. at 28–29. But "similar factual predicates" are not enough to warrant dismissal, *see Daccarett-Ghia*, 70 F.3d at 629, and the goal of obtaining assets that would further the claimant's flight is not enough. If it were, there would be no "relatedness" requirement in civil forfeiture proceedings because any challenge to forfeiture would possibly provide additional resources to assist the fugitive's flight. Of course, disentitlement might be appropriate when a fugitive's civil claim shares similar factual predicates with the claimant's

6

fugitive status and his or her claims are actually an attempt to obtain information about the related criminal proceedings. But the impact of the Ajakas' fugitive status is relatively limited at this point in these proceedings: The Court needs only to evaluate the administrative record to determine whether the government's designation was arbitrary and capricious. The Ajakas' fugitive status has little effect on the Court's "*own* docket and its *own* proceedings," *Daccarett-Ghia*, at 626, and the Court, in its discretion, declines to dismiss their claims on that basis.

### B.  APA Claim

The Ajakas argue that OFAC's designation was arbitrary and capricious because the evidence considered by OFAC was "extremely limited." *See* Pls.' Opposition to Def.'s Mot. to Dismiss/Summ. J. ("Pls.' Opp'n"), ECF No. 22-1 at 17. But there is no volume requirement for the amount of evidence needed to support OFAC's designations; such designations are governed by the judicial review provisions of the APA, 5 U.S.C. § 706(2)(A), and survive arbitrary and capricious review if they are reasonable and based on substantial evidence, *see Holy Land Found.*, 333 F.3d at 156; *Fla. Gas. Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010) ("The substantial evidence inquiry turns not on how many discrete pieces of evidence the [agency] relies on, but on whether that evidence adequately supports its ultimate decision.").

OFAC's designation was certainly reasonable: The indictment against the Ajakas, the press release detailing the facts surrounding that indictment, and agency reporting on specific transactions in which the Ajakas were engaged all support OFAC's determination that the Ajakas "provid[ed] or attempted to provide[] financial, material, technological or other support for, or goods or services in support of . . . a person whose property and interests in property are blocked pursuant to E.O 13382." 83 Fed. Reg. 39157. In particular, the record discusses the Ajakas' indictment for "a scheme to smuggle goods out of the United States and to supply services to

Syria." AR at 10. The Ajakas ran a business out of their home in Massachusetts to "procure goods, including electronics, computer equipment, and electrical switches, from U.S. companies and exported those goods out of the United States to customers in Lebanon and Syria." *Id.* at 11. One of those customers was added to the Department of Commerce's Entity List in 2007 for "involvement in the acquisition and/or development of improvised explosive devices used against U.S. troops in Iraq and Afghanistan." *Id.* at 10–11. There is evidence that the Ajakas knew that the customer operated a business in Syria and that they were providing broker services to him and his company (both also designated entities). *Id.* The Ajakas were paid over $200,000 in exchange for this service and concealed their illicit activity by "falsif[ying] shipping paperwork and undervalu[ing] goods being shipped overseas." *Id.* at 11.

The letters from HSI/ICE and CBP go into even more detail. *Id.* at 36–51. Among other things, they report that the Ajakas exported to a designated entity "core modules" and switches, *id.* at 36, 3D printers, *id.* at 45, laptops and laptop accessories, *id.* at 47, "micro servers [and] other electrical components," *id.* at 49, and other electrical equipment, *id.* at 51. On some occasions, Tony Ajaka travelled to Lebanon to deliver those items, *id.* at 49, and Anni Ajaka sent emails in which she discussed undervaluing certain items "so that we don't go through all this procedure avoiding formality papers and time," *id.* at 51. The letters identify the relevant dates for and Ajakas' role in each transaction. *Id.* at 36–51.

The Ajakas argue that these documents cannot constitute "substantial evidence" because they have not been convicted and because the record does not include copies of the individual emails and shipping records identified in the agency letters. Pls.' Opp'n at 17. But OFAC is not foreclosed from considering the indictment against the Ajakas merely because they have not been convicted, *see, e.g.*, *Zevallos v. Obama*, 10 F. Supp. 3d 111, 122 (D.D.C. 2014) (relying in part on

indictment against designated individual); *Joumaa v. Mnuchin*, 2019 WL 1559453 (D.D.C. Apr. 10, 2019) (upholding OFAC denial of petition for delisting, in part on reliance on indictment), and it may reasonably rely on agency reporting discussing specific evidence without also including in the record the documents described in that reporting, *see, e.g.*, *Holy Land*, 219 F. Supp. 2d at 65 n.5 (noting that OFAC is not required to rely on interrogation statements and hearing transcripts). On this record, and given the Court's deferential standard of review, there is no basis to set aside OFAC's designation.[4]

### C. Due Process Claim

The Ajakas' final claim alleges that OFAC's delay in producing the administrative record, 2d Am. Compl. ¶ 23, and delayed response to their reconsideration request, *id.* ¶ 24, violated their due process rights. In particular, they argue that OFAC impermissibly delayed production of the administrative record (produced about eight months after initially requested by the Ajakas, *id.* ¶ 23) and its decision to deny their reconsideration request, *id.* ¶ 24. It is far from clear that an eight-month delay in production of the administrative record would constitute a violation of the Ajakas' due process rights: courts in this District have certainly permitted longer delays, *see, e.g.*, *Zevallos*, 10 F. Supp. 3d at 129–131 (noting that a three-year delay did not violate due process), and when delays of similar length are found to violate due process it is largely because the designee lacked meaningful notice of its the reasons for the designation, *see, e.g.*, *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 905 (N.D. Ohio 2009); *Al Haramin Islamic Found v. U.S. Dep't of Treasury*, 686 F.3d 965, 979 (9th Cir. 2012). Such concerns are

---

[4] The Ajakas do not oppose the government's argument that it was reasonable to deny their request for reconsideration. *See* Pls.' Opp'n at 15–18; Defs.' Mot. at 26–27. The Court therefore treats the argument as conceded. *See Shaw v. District of Columbia*, 825 F. Supp. 2d 173, 177 (D.D.C. 2011) ("It is well-established in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, the court may treat those arguments that the plaintiff failed to address as conceded." (internal quotation marks and citation omitted)).

not present here, when the indictment and press release largely put the Ajakas on notice of the nature of the basis for OFAC's determination. *See Zevallos*, 10 F. Supp. 3d at 129–131 (distinguishing cases finding procedural due process violation in delayed production of administrative record on basis that those cases raised concerns about meaningful notice).

But even if OFAC's delay (in producing the administrative record or in denying the reconsideration request) violated due process, the delay would be harmless. "The harmless error rule applies to agency action because if the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) (citations omitted). The Ajakas ultimately provided no countervailing evidence to rebut OFAC's designation, nor did they request additional time to respond to the administrative record. They do not contend that "the circumstances resulting in the designation no longer apply." 31 C.F.R. § 501.807.[5] There was simply no basis for OFAC to reconsider the Ajakas' designation, and its decision to deny reconsideration would have been the same regardless of when it produced the administrative record.

## IV.     Conclusion

The government has demonstrated that OFAC's designation was reasonable and the Ajakas have not demonstrated any prejudice as a result of the time it took for OFAC to produce the administrative record and decide their reconsideration request. The Court therefore grants summary judgment to the government. An Order will be entered contemporaneously with this Memorandum Opinion.

---

[5] The regulations provide that, in order to seek reconsideration, a designee "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation." 31 C.F.R. § 501.807(a).

DATE:  August 17, 2021

CARL J. NICHOLS
United States District Judge